DANIEL ARMEL, *et al.,* V. JOHN J. LAYTON, *et al.*

1. VERDICT, *Conclusive in Supreme Court.* In an action tried by a jury, where one of the principal issues in the case is, what is the nature and character of a certain parol agreement previously entered into between the parties, and the case is submitted to the jury upon conflicting and contradictory parol evidence, and the jury find in favor of one party and against the other, and there is sufficient evidence to sustain the verdict of the jury, and the court below sustains the verdict, *held,* that in the supreme court the verdict as to the nature and character of the parol agreement will be considered conclusive.

2. WRITTEN CONTRACT; *Parol Agreement; Conclusive Verdict.* The plaintiff, under a written contract, furnished to the defendant certain cattle

Armel v. Layton.

to keep, feed and take care of for a certain number of years, the cattle in the meantime to remain the property of the plaintiff, and at the end of such time to be divided between the plaintiff and the defendant, the defendant to receive a portion of the cattle as his own, and the plaintiff to take the other portion; but before the expiration of such time the plaintiff took away a portion of the cattle under a parol agreement then entered into between the parties. The defendant afterward claimed that such parol agreement was that the plaintiff should return the cattle thus taken away from him, at some time during the next spring, or, if the plaintiff should elect not to return the same, then that the cattle so taken away should become the absolute property of the plaintiff, and the cattle remaining with the defendant should become the absolute property of the defendant; but the plaintiff claimed that no such agreement was entered into. When the next spring came the plaintiff elected to retain the cattle which he had taken away, and refused to return them to the defendant. There was evidence introduced on the trial sufficient to prove the said parol agreement as it was claimed to be by the defendant; but the evidence was conflicting and contradictory upon this point. The jury found in favor of the defendant, and the trial court sustained the verdict. *Held*, That the verdict of the jury will be considered conclusive in the supreme court.

3. ——— *Verdict Sustained.* And in such a case, whether the said parol agreement be considered as a sale or barter of the cattle upon condition, the condition being the election of the plaintiff at the next spring to retain the cattle taken away by him, or be considered as a common-law chattel mortgage, the verdict of the jury must be sustained; for in either case the agreement would be valid. And even if it be considered merely as a common-law chattel mortgage, still, as the plaintiff is in default, he has no right to a return or the possession of the mortgaged cattle still remaining in the possession of the defendant.

4. ——— The form of the verdict and the judgment in this case commented on, and held to be sufficient.

### *Error from Allen District Court.*

REPLEVIN, brought by *Armel & Jones* against *Layton* and others, to recover the possession of 119 head of cattle. Trial at the June Term, 1882, of the district court, and judgment for defendants. The plaintiffs bring the case here. The opinion contains a sufficient statement of the facts.

*Cates & Keplinger,* for plaintiffs in error.

*John R. Goodin,* and *J. E. Pickett,* for defendants in error.

37 — 29 KAS.

The opinion of the court was delivered by

VALENTINE, J.: This was an action of replevin, brought by Daniel Armel and Thomas Jones, partners as Armel & Jones, against John J. Layton, John Doe and Richard Doe, whose real names are unknown, to recover one hundred and nineteen head of cattle. The cattle were replevied — sixteen head thereof being taken from the possession of Layton, and the other one hundred and three head being taken from the possession of Butler Wood. Wood afterward appeared in the case in the place of John Doe. Both Layton and Wood answered, each answering separately, and each filing a general denial. The issues in the case were therefore as follows: (1) Were the plaintiffs Armel & Jones the owners of the property in controversy at the time of the commencement of this action? (2) Had they the right to the immediate possession of the property at that time? (3) Were the defendants Layton and Wood, or either of them, wrongfully detaining the cattle from the plaintiffs at the time they were replevied? The burden of proof with respect to each of these issues rested upon the plaintiffs, and unless they could affirmatively maintain each and all of these issues, they would necessarily fail in their action.

A trial was had before the court and a jury. A vast amount of conflicting testimony was introduced, and upon the pleadings and the evidence the jury found in favor of the defendants and against the plaintiffs, and judgment was rendered accordingly. The plaintiffs now seek to reverse this judgment, by bringing petition in error and a "case-made" to this court.

The plaintiffs claim as a principal ground for error, that the verdict of the jury is against the law and the evidence; but they also claim incidentally, that the court below misdirected the jury in one of its instructions; and they further claim that the judgment rendered is erroneous and "intensifies the errors of the verdict." These are about the only alleged errors presented for our consideration.

The facts of the case are substantially as follows: The plaintiffs originally owned the cattle in controversy. In October, 1877, while the plaintiffs still owned the cattle, a contract was made between the plaintiffs and Layton, by virtue of which the latter was to keep and feed the cattle in controversy, together with other cattle belonging to the plaintiffs, for the periods of time hereafter mentioned. One lot of these cattle, which was afterward spoken of in the evidence as the "big steers," was to be kept two years; at the end of which time there was to be a division, Layton to receive two-fifths thereof as his own, and the plaintiffs the other three-fifths. Another lot, which includes that portion of the cattle now in controversy which was replevied from Wood, was to be kept three years; at which time there was to be a division, Layton to receive and own one-half, and the plaintiffs the other half. There was also a lot of cows, which Layton was to keep three years; at which time the increase was to be divided, and the cows returned to the plaintiffs. These cows had six calves at the time when the action of replevin was commenced, which cows and calves are the cattle which were replevied from Layton. Under said contract the title to the cattle was to remain in the plaintiffs until the division thereof, and the plaintiffs in the meantime were to have a lien on Layton's interest therein for the faithful performance of the contract, as well as for advances that might be made by the plaintiffs. The contract was duly filed as a chattel mortgage, and kept alive as such by affidavit, as provided by statute. About the first of November, 1878, the "big steers," fifty-five in number, were returned to the plaintiffs in pursuance of an agreement then entered into between the plaintiffs and Layton. As to what this agreement was the parties do not agree, and the evidence introduced by the parties respecting it is irreconcilably conflicting. The agreement was made between Armel, on the part of Armel & Jones, and Layton for himself. Layton contends, in substance, that the agreement between himself and Armel was substantially that Armel might take the "big steers" away, and keep them until

sometime in the spring of 1879, and then return them to Layton; but that if Armel should not return them within that time, then that the transaction should be considered as a division of the cattle, Armel to keep and own the "big steers," and Layton to keep and own the other cattle still remaining in his possession; while Armel, on the other side, claims that he was to take, and did take, the "big steers" from Layton for no other reason than that Layton did not have feed to winter them; and that not one word was said by either of the parties, nor one thought entertained by himself, as to whether the "big steers" should ever be returned again to Layton, or not; and that there was no arrangement or agreement made between the parties at that time with respect to the cattle which still remained in Layton's possession, and nothing said that could possibly change or modify the original contract in the slighest degree with respect to the cattle still remaining in Layton's possession. Both Layton and Armel testified in the case, and both testified with regard to this subsequent agreement. Layton was corroborated by three other witnesses, while Armel was corroborated by only one, if indeed he was corroborated by any. Upon the terms of this agreement the decision of the entire case depends. If Layton is correct, the decision of the court below was rightfully rendered in favor of the defendants; but if Armel is correct, the decision should be rendered in favor of the plaintiffs. The next spring came and passed, and Armel failed and refused, even upon request, to return the "big steers," as Layton claims he agreed to do; and Layton then, about the first of June, 1879, sold the second lot of cattle, 103 head, to Butler Wood for $1,948, and Wood immediately took possession of them. Afterward, but within a few days, the plaintiffs replevied these cattle from Wood, and replevied the cows and calves from Layton. The replevin suit in which these cattle were replevied from Wood and Layton was a joint suit, brought against Wood and Layton jointly.

We think it will now appear that the decision of this case

depends entirely upon the character of the parol contract entered into between Armel and Layton, about November 1, 1878; and with reference to this contract, we think the instructions of the court below were at least as fair toward the plaintiffs as they had any right to demand. The court below instructed the jury in substance that the plaintiffs were entitled to recover, unless this subsequent parol agreement made in the fall of 1878 between Armel and Layton was substantially what Layton claimed it to be; and the court charged specifically that the burden of proving this subsequent parol agreement rested wholly upon the defendants. The court also instructed the jury in substance that if the defendant Layton did not fully comply with all the terms and requirements of the original written contract made between Layton and the plaintiffs in the fall of 1877, up to the time Layton claims that the "big steers" were to be returned to him, or if the subsequent parol contract did not by its terms make Layton the absolute owner of the cattle remaining in his possession at the time when Layton claims that the "big steers" should have been returned to him, the plaintiffs should recover. The court also instructed the jury that if the subsequent parol agreement merely gave the cattle to Layton to hold as a security or pledge, then that the plaintiffs were entitled to recover. We think this was as favorable to the plaintiffs as they could reasonably ask. The instructions which have been specially pointed out to us by the plaintiffs, and with regard to which a claim of error is made, read as follows:

"But it is claimed by the defendants that since the execution of the written contract entered into by Armel & Jones and Layton, and since the parties entered upon the execution of the same, a subsequent agreement was made between them, by which the plaintiffs were to take away a portion of the contract cattle designated during the trial as the 'big cattle,' for the purpose of feeding during the winter and returning to Layton in the next spring to herd and care for under the original contract. And the defendant Layton further claims that by the terms of this subsequent agreement, upon a failure of the plaintiffs to return the big steers at the time agreed upon, the failure gave to him, Layton, the absolute ownership

or right to retain as his own all cattle remaining with him at the time the big cattle were taken away from him under this subsequent agreement.

"If such agreement was made, it is valid and binding upon the parties to this action; and if not complied with by the plaintiffs, the defendants are entitled to a verdict, as I shall now explain. . . . If you find from the evidence that the parties by their talks or agreements had or made subsequent to the execution of the written contract intended that the defendant Layton should not be considered the absolute owner of the cattle left with him, even if the big steers were not returned according to such talks of agreements, and that he should only hold or possess them as security or as a pledge that the big cattle would be returned, and that their respective interests should remain as under the original or written contract, then you should find for the plaintiffs."

The 103 head of cattle taken from the possession of Wood on the writ of replevin were allowed to remain in the possession of the plaintiffs. The ten cows and six calves taken from the possession of Layton were returned to him on a redelivery bond. The verdict of the jury reads as follows:

"We, the jury, find for the defendants, that at the time of the commencement of this action they were the owners and entitled to the immediate possession of the property in controversy; that the same (except the ten cows and six calves) is now wrongfully detained from them by the plaintiffs; and that it is of the value of $1,948."

The word "it" in the last part of the verdict undoubtedly means "the property in controversy" "wrongfully detained from them [the defendants] by the plaintiffs;" that is, "the property in controversy," "except the ten cows and six calves." This property was sold by Layton to Wood for $1,948, just what the jury found it to be worth. We do not think that the value of the property as found by the jury was intended to include the value of the ten cows and six calves.

We think the judgment substantially follows the verdict. At least we think a fair and reasonable construction of both the verdict and the judgment makes the two harmonize. The defendants already have the ten cows and six calves in their possession, and these they are entitled to retain; and, accord-

ing to the verdict, they are entitled to recover the possession of the 103 head of cattle, now in the possession of the plaintiffs, or their value as fixed by the jury at $1,948. The judgment is a joint judgment, being rendered in favor of the defendants jointly and against the plaintiffs jointly. The plaintiffs now claim that this is erroneous, forgetting of course that they jointly prosecuted the defendants jointly for a joint wrong, and that they did not raise any question in the court below with respect to the several rights or several liabilities of the defendants. But if the plaintiffs themselves have no right to recover as against the defendants, or either of them, then what right have they to dictate as to how the judgment should be rendered as between the defendants, or to say how the cattle or their value should be divided as between the defendants?

With respect to the facts of this case, the jury found in favor of the defendants and against the plaintiffs, upon conflicting and contradictory parol testimony, and there was sufficient testimony to sustain the verdict. This we think ends the case with respect to the facts. But there is still one phase of the case, principally legal, which we think requires a few words. Suppose that Layton's title to the cattle in his possession at the time that Armel failed to return the "big steers" was that of a mortgagee, and not that of an absolute and unconditional owner: then had Layton the power, as against the plaintiffs, to sell a portion of them and to keep the remaining portion, as he did in this case? We think this question must be answered in the affirmative. If Layton was a mortgagee, he must account, however, to his mortgagor for the surplus over and above what it requires to make him whole; while if he was an absolute and unconditional owner of the cattle, he will not be required to render any account to any person. That he was not a mere pledgee without title, the jury have certainly found by their verdict, and so found upon sufficient evidence. See last paragraph quoted above of the instructions of the court. The least that Layton could possibly be, under the verdict, would be a mortgagee,

with power, after default on the part of Armel to return the "big steers," to dispose of the property as his own until he had made good his loss occasioned by Armel's default. Of course the said parol agreement between Armel and Layton was not a statutory chattel mortgage, for such a mortgage should be in writing; but if it was not a contract of a higher nature than a chattel mortgage, if it was not such a contract as would transfer to Layton an absolute and unconditional title to the property on default of Armel, then we think it was such a contract as would create and constitute a good chattel mortgage at common law; and in either case, under the facts as found by the jury, we think the defendants were entitled to recover. The jury probably believed that Layton, by virtue of the contract and default of Armel, became the absolute and unconditional owner of the cattle; that the contract and the default taken together constituted a final division of the cattle — the plaintiffs becoming the absolute owners of the "big steers," and Layton becoming the absolute owner of the remaining cattle. They probably believed that the contract amounted to a sale or barter upon condition, the condition being the election of Armel at the next spring to retain the "big steers," and that when the condition was fulfilled by Armel electing to keep the "big steers," the sale or barter became absolute; and that the contract did not at any time, either before or after Armel's election, or Armel's default, as we have generally called it, amount to a mere security of any kind. It must be remembered, however, that even if the contract amounted to only a security, still the plaintiffs are in default, and have never offered to redeem the property in controversy by performing their part of the contract; and hence, if the supposed security amounts to a chattel mortgage, they have no right to recover the possession of the property in this action. They have no right to a return of the mortgaged cattle while they are in default.

After a careful consideration of all the questions involved in this case, and of all the questions presented to us by coun-

sel, we have come to the conclusion that no substantial error was committed by the court below as against the plaintiffs; therefore, the judgment of the court below will be affirmed.

All the Justices concurring.